# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

No. 13-31262
Summary Calendar

United States Court of Appeals
Fifth Circuit

**FILED**

April 10, 2014

Lyle W. Cayce
Clerk

OLESS BRUMFIELD; ET AL.,

Plaintiffs,

UNITED STATES OF AMERICA,

Intervenor–Appellee,

versus

WILLIAM J. DODD,
Superintendent of Public Education of the State of Louisiana; ET AL.,

Defendants,

MITZI DILLON; TITUS DILLON; MICHAEL LEMANE;
LAKISHA FUSELIER; MARY EDLER;
LOUISIANA BLACK ALLIANCE FOR EDUCATIONAL OPTIONS,

Movants–Appellants

Appeal from the United States District Court
for the Eastern District of Louisiana

Before JOLLY, SMITH, and CLEMENT, Circuit Judges.

JERRY E. SMITH, Circuit Judge:

In this appeal of an order denying intervention, the movants are parents

No. 13-31262

whose children receive school vouchers via Louisiana's Scholarship Program. The legislature established the Program in 2012 to provide funding to low-income parents with children in failing schools so that they may have the option of sending them to better schools, including private schools, of their own choosing. LA. REV. STAT. ANN. § 17:4013. The parents seek to intervene in this litigation between Louisiana and the federal government over the state's voucher program. We reverse the order denying intervention.

I.

On August 22, 2013, the United States filed a motion seeking "permanently [to] enjoin the State of Louisiana . . . from awarding any school vouchers . . . to students attending school in districts operating under federal desegregation orders unless and until the State receives authorization from the appropriate federal court overseeing the applicable desegregation case." This case, as reflected in the caption, involves the desegregation order issued in *Brumfield v. Dodd*, 405 F. Supp. 338 (E.D. La. 1975) (three-judge court), which prohibited the provision of public funds or other assistance "to any racially discriminatory private school or to any racially segregated private school" and created a certification process to establish private-school eligibility for receiving public funds. *Id.* at 349.

The United States initially sought the injunction on the ground that the voucher program constituted public assistance to private schools in violation of the desegregation order: "The State's actions in using public funds to transfer students in districts operating under desegregation orders to schools which they are not zoned to attend," argued the government, "cause irreparable injury to the court-ordered desegregation process, the parties to the desegregation action, and ultimately to the students and the communities governed by the desegregation decree." The government further urged that the program

2

No. 13-31262

"deprives the students of their right to a desegregated educational experience."

The parents moved to intervene as a matter of right for the limited purpose of opposing the motion for permanent injunction. The United States, however, claims that on September 23, 2013, it had informed the court that,

> in light of the information already provided by the State and the information the court had ordered the State to produce, the only relief the United States now sought was the creation of a process under which the State would provide the information needed to assess and monitor the voucher program's implementation consistent with the orders in this case on a regular and timely basis.

Therefore, according to the United States, it no longer sought the relief requested in its August motion, and the intervention motion did not explain "how [the parents'] interests could be affected by the relief now being sought."

The district court agreed with the United States and denied intervention. "Because the Motion that Proposed Intervenors sought to oppose no longer requests the remedy Proposed Intervenors objected to," the court held, "they lack the necessary interest to intervene. The only remaining issues in the case, at this time, [a]ffect the sharing of information between the United States and the State of Louisiana. These issues simply do not [a]ffect the interests of Proposed Intervenors." The district court did allow for the possibility of a renewed intervention motion should the United States seek its original relief.

## II.

A court "must permit anyone to intervene who . . . claims an interest relating to the property or transaction that is the subject of the action, and is so situated that disposing of the action may as a practical matter impair or impede the movant's ability to protect its interest, unless existing parties adequately represent that interest." FED. R. CIV. P. 24(a). A party seeking to intervene as of right must satisfy four requirements:

3

No. 13-31262

(1) The application must be timely; (2) the applicant must have an interest relating to the property or transaction that is the subject of the action; (3) the applicant must be so situated that the disposition of the action may, as a practical matter, impair or impede its ability to protect its interest; and (4) the applicant's interest must be inadequately represented by the existing parties to the suit.

*Sierra Club v. Espy*, 18 F.3d 1202, 1204–05 (5th Cir. 1994) (citing *New Orleans Pub. Serv., Inc. v. United Gas Pipe Line Co. ("NOPSI")*, 732 F.2d 452, 463 (5th Cir. 1984) (en banc)).

Although the movant bears the burden of establishing its right to intervene, Rule 24 is to be liberally construed. 6 JAMES W. MOORE ET AL., MOORE'S FEDERAL PRACTICE [hereinafter MOORE'S] § 24.03[1][a], at 24-22 (3d ed. 2008); *In re Lease Oil Antitrust Litig.*, 570 F.3d 244, 248 (5th Cir. 2009). The inquiry "is a flexible one, and a practical analysis of the facts and circumstances of each case is appropriate." 6 MOORE'S § 24.01[1][a], at 24-24; *Edwards v. City of Hous.*, 78 F.3d 983, 999 (5th Cir. 1996) (en banc). We review a denial of a right to intervene *de novo*. *Sierra Club*, 18 F.3d at 1205.

III.

Because timeliness is not at issue, we address only the other three prongs. Before doing so, however, we address a material factual dispute.

A.

The United States contends that the parents do not have an interest in this litigation—and that if they do, it is not likely to be impaired—because they have not explained how the new relief the government seeks involves or impairs any interest of the parents. The government also maintains that the parents' arguments as to interest and impairment are therefore waived because they were not presented to the district court. In other words, the

4

government hinges its argument respecting these prongs almost entirely on its claim that it is no longer seeking the relief it previously sought in its August motion.  We now explore that claim.

As previously discussed, in that motion the government sought a permanent injunction of the voucher program "unless and until the State receives authorization from the appropriate federal court overseeing the applicable desegregation case."  The district court issued an order on September 18 that prompted the United States to supplement its initial August motion.   The United States claims that as a result of that order, the three objectives of its August motion "are now in the process of being fulfilled" because the state has agreed to provide, to the government, data on the voucher program.

As the government states in its supplemental motion, however, the September 18 order required the parties to brief and argue two legal issues: whether the desegregation order applies to the Scholarship Program, and if so, whether there is any need to amend existing orders.  Significantly, in its supplemental motion the United States *rephrased* the district court's first question as follows:  "(1) [D]oes the desegregation order issued in *Brumfield* apply to the Voucher Program so as to require the State to obtain authorization from the Court prior to implementation?"  The government then stated, "To the extent this Court determines it appropriate to resolve those two questions in the affirmative, and a schedule is put in place to facilitate compliance and the timely sharing of school voucher program data and analysis by Louisiana as requested by the United States, it is the position of the United States that the relief sought by the August Motion will have been satisfied."

It is not credible for the United States to claim that the relief it is now seeking differs from the relief the parents opposed in the August motion, in which it sought to enjoin the program *unless and until the State receives authorization from the appropriate federal court overseeing the applicable*

*desegregation case.* In the supplemental motion, the government explains that to the *extent* that the Court affirmatively answers the first question, it believes the goal of its prior motion has been satisfied. But an affirmative answer to the first question as *rephrased* by the government would be "the desegregation order applies" and so "the state requires authorization from the court prior to implementation." There is no real difference between that relief and the relief previously sought. Both would demand an injunction *unless and until* the state obtained court authorization.[1]

## B.

### 1.

For intervention, a movant's interest must be "direct, substantial, and legally protectable." 6 MOORE'S § 24.01[2][a], at 24-25; *Edwards*, 78 F.3d at 1004; *Sierra Club*, 18 F.3d at 1207. This court several times has found interests remarkably similar to the interest of the parents here to be sufficient.

In *Black Fire Fighters Ass'n of Dallas v. City of Dallas, Texas*, 19 F.3d 992, 994 (5th Cir. 1994), the city entered into a consent decree with an employee group, agreeing to give a specified number of promotions to black officers who would not otherwise be chosen because of their scores on an exam. The association challenged the intervention of a different group of firefighters. We held that "[a] decree's prospective interference with promotion opportunities can justify intervention." *Id.* In *Sierra Club*, 18 F.3d at 1207, we held that lumber companies had an interest sufficient for intervention because their "existing timber contracts" were "threatened by" an injunction potentially

---

[1] Therefore, to the extent the government suggests that the parents have waived their contentions because they failed to raise any arguments with respect to the purportedly different relief sought, we disagree.

prohibiting the Forest Service from selling certain timber.

In *Edwards*, our en banc court reversed a denial of intervention on grounds similar to those in *Black Fire Fighters*. There, the police department had entered into a consent decree with black and Hispanic officers; the district court had denied intervention by a group of white, female, and Asian-American officers. *Edwards*, 78 F.3d at 989. The main complaint of that group was "that the Consent Decree adversely affects the interests of its members in having equal access to a promotion system and promotion opportunities within the [department] for the ranks of Sergeant and Lieutenant without reference to race, color, or national origin." *Id.* at 1004. We held that that complaint stated a sufficient interest for intervention.

Here, a *potential* decree—an amendment to the original decree in this action from 1975—similarly threatens a "prospective interference with" educational opportunities. Further, any decree might "adversely affect[] the interests of [the parents] in having equal access to . . . opportunities . . . without reference to race, color, or national origin." Finally, "existing" scholarships are "threatened by" a potential bar on certain kinds of vouchers. The United States points to *United States v. Perry County Board of Education*, 567 F.2d 277 (5th Cir. 1978), for the proposition that this court has found that parents do not have a sufficient interest to intervene in desegregation proceedings. The parents challenge the very premise that the Scholarship Program is subject to any such proceedings. Even so, an old desegregation case involving a policy dispute over the location of a newly built school, *see Perry*, 567 F.2d at 279–80, is far less apposite than are *Sierra Club*, *Edwards*, and *Black Fire Fighters*.

To be sure, the United States is claiming that, at the moment, it has no intention of halting the voucher program or depriving anyone of an existing scholarship. Yet, if a modification of the decree requiring court approval means anything, it signifies that the government will have the ability to attempt to

adjust *some* element of the Scholarship Program—either by changing which students receive the aid or changing the schools in which they are placed—if not to urge that the program be killed entirely. The possibility is therefore real that if the parents are not able adequately to protect their interests, some students who otherwise would get vouchers might not get them or might not get to select a particular school they otherwise would choose. The parents need not wait to see whether that ultimately happens; they have already described an interest justifying intervention.

The public interest easily supports intervention: "The interest requirement may be judged by a more lenient standard if the case involves a public interest question or is brought by a public interest group. The zone of interests protected by a constitutional provision or statute of general application is arguably broader than are the protectable interests recognized in other contexts." 6 MOORE'S § 24.03[2][c], at 24-34 (citing *NOPSI*, 732 F.2d at 464–65). Our en banc court has explained that a zone-of-interest analysis in standing doctrine can bear on the interest question for purposes of intervention. *NOPSI*, 732 F.2d at 464–65.

The purported aim of the United States is to enforce the Equal Protection Clause of the Fourteenth Amendment. If any group can be described as within the zone of interest protected by that clause, surely it is these mostly minority parents who believe that the best way to ensure equal protection of the laws is to give them the opportunity—along with other parents who live in poverty and whose children are in failing schools—to send their children to better schools. The parents are also within the zone of interest of the legislation enacting the Scholarship Program; indeed, these parents and their children were its primary intended beneficiaries. They therefore assert not only a matter of public interest but matters more relevant to them than to anyone else.

No. 13-31262

2.

"Once a movant has successfully established a sufficient interest in the subject of the action, the movant must demonstrate that disposition of that action may, as a practical matter, impair or impede the movant's ability to protect that interest." 6 MOORE'S § 24.03[3][a], at 24-41; *Sierra Club*, 18 F.3d at 1207. The impairment requirement does not demand that the movant be bound by a possible future judgment, and the current requirement is a great liberalization of the prior rule. 6 MOORE'S § 24.03[3][a], at 24-41; *Edwards*, 78 F.3d at 1004–05. The impairment must be "practical," however, and not merely "theoretical." 6 MOORE'S § 24.03[3][a], at 24-42.

The parents have established that their interests might be impaired by this action. If the desegregation order is modified to require prior court approval of the Program's implementation, then some parents are at risk of losing vouchers or their full range of school choices. We found similarly in *Edwards*, 78 F.3d at 1005, that the officers would be bound by the consent decree and therefore would be "limited in their future promotion opportunities."

To be sure, there is as of yet no order requiring a change in the voucher program. But the parents do not need to establish that their interests *will* be impaired. Rather, they must demonstrate only that the disposition of the action "may" impair or impede their ability to protect their interests. 6 MOORE'S § 24.03[3][a], at 24-41.[2] It would indeed be a questionable rule that would require prospective intervenors to wait on the sidelines until after a court has already decided enough issues contrary to their interests. The very

---

[2] *See also Grutter v. Bollinger*, 188 F.3d 394, 399 (6th Cir. 1999) ("To satisfy this element of the intervention test, a would-be intervenor must show only that impairment of its substantial legal interest is *possible* if intervention is denied. This burden is *minimal*." (emphasis added)).

purpose of intervention is to allow interested parties to air their views so that a court may consider them before making potentially adverse decisions.

In *Grutter*, the court found the impairment element satisfied with respect to groups of minority students because "[t]here is little room for doubt that access to the University for African–American and Latino/a students will be impaired to some extent and that a substantial decline in the enrollment of these students *may well result if* the University is precluded from considering race as a factor in admissions." *Grutter*, 188 F.3d at 400 (emphasis added). Here, similarly, the parents' access to vouchers will be impaired because a decline in prospects for obtaining vouchers may well result if the district court holds that the Scholarship Program is subject to the desegregation order.

### 3.

"The final requirement for intervention as a matter of right is that the applicant's interest must be inadequately represented by the existing parties to the suit. The applicant has the burden of demonstrating inadequate representation, but this burden is 'minimal.'" *Sierra Club*, 18 F.3d at 1207. "The burden on the movant is not a substantial one. The movant need not show that the representation by existing parties will be, for certain, inadequate. . . . [T]he applicant's burden on this matter should be viewed as 'minimal.'" 6 MOORE'S § 24.03[4][a], at 24-47 (citing *Trbovich v. United Mine Workers of Am.*, 404 U.S. 528, 538 n.10 (1972)).

This requirement, however, must have some teeth, so there are two presumptions of adequate representation. *Edwards*, 78 F.3d at 1005. The first arises where one party is a representative of the absentee by law. *Id.* Here there is no suggestion that the state is the parents' legal representative. The second presumption "arises when the would-be intervenor has the same ultimate objective as a party to the lawsuit," in which event "the applicant for

intervention must show adversity of interest, collusion, or nonfeasance on the part of the existing party to overcome the presumption." *Id.*

The second presumption does not apply here. Although both the state and the parents vigorously oppose dismantling the voucher program, their interests may not align precisely. In *Sierra Club* the Forest Service was defending against the claims of various environmental groups and ultimately lost on the merits. A preliminary injunction was therefore issued, whereupon the Service indicated it would comply with the injunction and stop selling certain kinds of timber. It was at that point that the timber companies attempted to intervene. *Sierra Club*, 18 F.3d at 1204. The plaintiffs similarly contended that the Service adequately represented the movants' interest because the interests were essentially identical. *Id.* at 1207. We rejected that claim because in complying with the injunction, the Service would be acting contrary to the interests of the companies. *Id.* at 1207–08.

To be sure, that may not be enough to satisfy the inadequate-representation prong generally; if it could, then no analysis of adequacy of representation *during* trial would be necessary. In *Sierra Club* the intervenors attempted to intervene after the injunction had issued; here, on the other hand, there is yet no injunction. Nonetheless, in *Sierra Club* we bolstered our reasoning by noting that "[t]he government must represent the broad public interest, not just the economic concerns of the timber industry," and therefore the timber groups satisfied the minimal burden of showing inadequacy.

Although a private group does not always satisfy this prong just because a governmental entity is on the same side of an issue, in this case the parents have easily met their minimal burden. The state has many interests in this case—maintaining not only the Scholarship Program but also its relationship with the federal government and with the courts that have continuing desegregation jurisdiction. The parents do not have the latter two interests; their

only concern is keeping their vouchers.  We cannot say for sure that the state's more extensive interests will *in fact* result in inadequate representation, but surely they might, which is all that the rule requires.

Further, the parents are staking out a position significantly different from that of the state, which apparently has conceded the continuing jurisdiction of the district court.  For example, the state has admitted that "the Scholarship program does constitute State aid subject to the orders and decrees in this case," but the parents challenge that notion, citing *Zelman v. Simmons-Harris*, 536 U.S. 639 (2002), for the proposition that school vouchers do not constitute aid to private schools.

In *Edwards* the defendant city thought it needed to "change the existing promotional policies and procedures" of the police department, whereas the group attempting to intervene urged that those policies needed no adjustment. *Edwards*, 78 F.3d at 1005.  That was enough to *rebut* the presumption of adequate representation stemming from purportedly identical ultimate objectives. Here the case for intervention is even stronger.  First, it is not evident that the ultimate-objective presumption of adequate representation even applies because the state has more extensive interests to balance than do the parents. The lack of unity in all objectives, combined with real and legitimate additional or contrary arguments, is sufficient to demonstrate that the representation *may* be inadequate, so this requirement of Rule 24(a) is met.[3]

Because the parents have met the requirements for intervention as of right, the denial of their motion to intervene is REVERSED.

---

[3] We note that parents were granted intervention in *Simmons-Harris*, and although state-court cases are not dispositive or binding on us, our ultimate conclusion is supported by other school-voucher cases in which parents were allowed to intervene. *See, e.g., Meredith v. Pence*, 984 N.E.2d 1213 (Ind. 2013); *Owens v. Colo. Cong. of Parents, Teachers & Students*, 92 P.3d 933 (Colo. 2004); *Kotterman v. Killian*, 972 P.2d 606 (Ariz. 1999); *Jackson v. Benson*, 578 N.W.2d 602 (Wis. 1998).